CAVANAGH, J.
(dissenting). Today the majority says much, but changes little, in its attempt at “fine-tuning,” ante at 530, our longstanding method for assessing reasonable attorney fees under MCR 2.403(0), which has remained unchanged since this Court unanimously adopted it 25 years ago in Wood v Detroit Automobile Inter-Ins Exch, 413 Mich 573; 321 NW2d 653 (1982).[1] In fact, despite the majority’s attempt to aid appellate *544 review and increase the consistency of reasonable attorney-fee awards, its new variation of the Wood-factors method changes little because, in the end, it still leaves the trial court with broad discretion in awarding reasonable attorney fees under the rule. Accordingly, I would not tinker with the Wood factors simply because in this case a contingency-fee attorney was awarded an hourly-rate fee that some on this Court would not have accepted had they been the trial judge. The Wood-factors method is not broken; therefore, I respectfully dissent from the majority’s attempt to fix it.
In applying the Wood factors to this case, I would affirm the trial court’s determination regarding the reasonable attorney fee for plaintiff s lead attorney, Mr. Gittleman, because that ruling was not an abuse of discretion, as it was guided by several of the Wood factors.[2] Further, the trial court’s reasoning was supported by the information presented to the trial court, which included Mr. Gittleman’s curriculum vitae, previous decisions supporting similar fee awards for his *545 services, and plaintiffs billing records. Also, defendant was offered an opportunity to contest these assertions at a hearing, but he expressly waived the opportunity. Thus, I do not agree with the majority’s assertion that the attorney-fee award regarding Mr. Gittleman’s services requires further analysis.
However, I do agree with the majority that the trial court did not conduct sufficient analysis to support its award of attorney fees regarding plaintiffs second-, third-, and fourth-chair attorneys. Thus, regarding those awards, I would remand to the trial court for further analysis under our longstanding precedent in Wood.
Turning to the majority’s new fine-tuned method, this new method begins by determining the fee customarily charged in the locality for similar legal services. The majority limits what may be used to establish the customary fee to “testimony or empirical data found in surveys and other reliable reports,” but “the fee applicant must present something more than anecdotal statements to establish the customary fee for the locality.” Ante at 531-532. The majority also requires the claimant to provide more than his attorney’s own affidavit as proof of the attorney’s hourly fee.[3] Then, as an example of a reliable report, the majority accepts the snapshot of the economic status of attorneys in Michigan (Snapshot) that was published in the November 2003 issue of the Michigan Bar Journal. In essence, the *546 majority directs lower courts to use this report to start their analyses by finding the hourly rate for the average attorney in the applicable field and locality.[4] Next, the majority requires this average fee to be multiplied by the reasonable number of hours expended in the case to give a baseline fee amount. Then, the majority allows trial courts to adjust the fee award upward or downward by applying “the remaining Wood/MRPC factors.” Ante at 531.[5] Finally, the trial court must “briefly discuss its view of the remaining factors” in order to aid appellate review. Ante at 531.[6]
I see several problems with this new method that make its results no more consistent and reviewable than the Wood-factors method that it aims to fine-tune. First, I am not convinced that the starting point for this issue should be the customary fee in the locality, multiplied by the hours expended on the case. While that figure is undoubtedly a valid factor in the reasonable-attorney-fee analysis, I disagree with the majority’s *547 attempt to give that one factor inordinate emphasis by making it the baseline amount from which all adjustments must be made. I note that this starting point method is very similar to the federal lodestar method, which begins its analysis by taking the reasonable hourly fee and multiplying it by the hours expended. In Pennsylvania v Delaware Valley Citizens’ Council for Clean Air, 478 US 546, 564; 106 S Ct 3088; 92 L Ed 2d 439 (1986), the United States Supreme Court adopted the lodestar method and stated that the “starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.” But my inclination against such a starting-point method, or lodestar method, is neither novel nor contrary to the views of all members of this very Court. Indeed, just eight years ago every justice in today’s majority joined the opinion per curiam in Dep’t of Transportation v Randolph, 461 Mich 757, 766 n 11; 610 NW2d 893 (2000), in which we unequivocally stated that we “reject the . . . argument that the ‘lodestar’ method is the ‘preferred’ way of determining the reasonableness of requested attorney fees.” Thus, by fine-tuning the Wood-factors method, the majority has effectively adopted some version of the lodestar method and overruled Randolph in part.[7]
*548 To be clear, I am not opposed to giving the average fee equal weight in this multifactor reasonable-fee analysis; but I am opposed to it playing a paramount role by being the starting point because the average fee does not represent the reality that a reasonable attorney fee under MCR 2.403(0) is not preliminarily derived from an average attorney fee charged in a locality.[8] This is evidenced in several respects.
First, the reasonable attorney fee awarded under MCR 2.403(0) is retrospective in its analysis, whereas the average rate charged in a locality is prospective in its focus. In other words, attorney fees awarded under MCR 2.403(0) depend heavily on, among other things, what work was required because of the other party’s rejection of the case-evaluation award, the outcome of *549 the case, and the skill that the outcome required — all of which depend on the trial’s outcome. This stems from the text of the court rule, which expressly limits its award to “the opposing party’s actual costs ...,” MCR 2.403(0X1) (emphasis added), which are defined as “a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation,” MCR 2.403(0)(6)(b) (emphasis added). Accordingly, the reasonable attorney fee is what the trial court recognizes, after completion of the trial, as the reasonable value of that particular attorney’s service in that particular trial. This award is not necessarily what the client and his attorney agreed to as the fee, but it could be as high as the agreed-to amount.[9]
In contrast, the average rate charged in a locality, which the majority’s rule initially relies on, involves a prospective focus because it uses the fees on which parties and their lawyers have agreed before the pending litigation. Thus, while this average rate is a relevant factor in the reasonable-fee analysis, it should not be the starting point any more than any other relevant factor should be, because it does not share the retrospective focus that MCR 2.430(0) expressly requires.
Also, the majority’s average-rate method wrongly assumes that the average rate exists for any given legal service performed. While an average rate may exist for some repetitive or general legal services, it does not exist for the work conducted in prosecuting a claim through formal litigation, as is required in every case involving case-evaluation sanctions. In other words, *550 every time a party imprudently rejects a case-evaluation award, the opposing party is forced to subject its claim to the slower, more expensive rigors of trial.[10] And it is undisputed that no two trials are the same; thus, no two reasonable trial fees are the same. In essence, the majority rule asks us to accept the illogical premise that legal services provided at trial are like manufactured products that the consumer can take off a store’s shelf, each identical product being equally valuable. But, even within the very same attorney’s cases, the average billing rate does not necessarily equate to the reasonable value of the attorney’s performance at a given trial.[11]
As noted earlier, this reality is exactly what the multifactor Wood method recognizes and the retrospective language of MCR 2.403(0) requires. The majority’s starting-point rule does not recognize this and makes the illogical assumption that the average rate charged by similarly skilled advocates is presumptively reasonable, and only then adjustable for individual circumstances. I would not start the analysis with the average attorney fee because that construct is not in accord with the language of the court rule or its purpose.[12]
*551 Also, I question the majority’s assertion that the average attorney fee for a particular attorney’s services is easily ascertainable. In conclusory fashion, the majority states that “[t]he reasonable hourly rate represents the fee customarily charged in the locality for similar legal services, which is reflected by the market rate for the attorney’s work.” Ante at 531. But, contrary to the majority’s assertion, the market rate for an individual attorney’s work is not some figure that can be plucked from a reference manual or interpolated from a statistical graph. The fallacy of such a proposition has been noted by the United States Supreme Court when, in a similar context, it stated:
[Determining an appropriate “market rate” for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively — even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer’s customary rate.... Nevertheless,... the critical inquiry in determining reasonableness is now generally *552 recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons. [Blum v Stenson, 465 US 886, 895 n 11; 104 S Ct 1541; 79 L Ed 2d 891 (1984).]
I agree with the Court in Blum-, the appropriate hourly rate is a valid inquiry, and assessing that rate should include comparisons with rates for similar services. And, like the Court in Blum, I recognize that the market rate for any given attorney is simply not an easily grasped number; thus, I disagree with the majority’s attempt to initially set the appropriate hourly rate at the average rate for attorneys in a particular locality.
Nonetheless, assuming that such an average rate, or market rate, for a given attorney is easily ascertainable, the majority gives little guidance regarding how its new rule adds to what trial courts have already been using in evaluating reasonable attorney fees. The majority states that the average rate, or market rate, can be established by “testimony or empirical data found in surveys and other reliable reports.” Ante at 531-532. First, I note that, if the majority insists on finding the market rate, one of the best indicators of the market rate for a service is what a consumer agreed to pay for it, i.e., the hourly rate on which this particular attorney and his client agreed. I would not require an attorney and his client to give testimony to prove they agreed to a certain hourly fee when the court can deduce as much by simply looking at the billing documents, as the trial court did in this case.[13]
Second, regarding empirical data and reliable reports, it is unclear what standard of admittance courts *553 are to apply to such sources. Apparently by way of example, the majority points to the survey described in the Snapshot conducted by the state bar.[14] While the state bar’s surveys are very useful in giving a broad picture of the financial status of the practice of law in Michigan, I would not cede our courts’ discretion in assessing reasonable attorney fees to surveys that derive their conclusions from voluntary submissions. In fact, the survey was sent to only 25 percent of the members of the Michigan bar. What is more, only 20 percent of those surveys were returned. Thus, this “reliable” source is based on the responses of only 5 percent of the legal practitioners in this state. This is a stunningly low sample from which to assess the “fee customarily charged in the locality for similar legal services ....” Ante at 531. Also, the survey’s ability to give average hourly fees in a particular locality is limited because in many of its localities it received only a small number of responses. For instance, in Muskegon County the hourly fee is based on a paltry four responses, which supposedly gives the average of all types of practices in that locality. In fact, in 12 of the 30 localities sampled, the survey reports less than 10 responses.[15]
The majority also does not describe how the survey is to be used to determine the customary fee for similar legal services. This lack of direction creates a problem in this case because the survey does not include a category for dental malpractice; in fact, it does not even *554 include the broader category of medical malpractice. Accordingly, I question this survey’s ability to give any guidance beyond that already available to the trial court, especially regarding this case’s unique practitioner.[16] In this regard, the majority concedes that its lone example of a reliable report is of small utility: “[T]he benefit of such studies would be magnified by more specific data relevant to variations in locality, experience, and practice area.” Ante at 532. Nevertheless, the majority gives the lower courts no direction on how to use this survey while they wait for more specific surveys.
I am also troubled by the ramifications of the majority’s rule because any practitioner who reads this opinion now realizes that his voluntary submissions to surveys are powerful enough to affect the future results of attorney-fee awards. In other words, the majority unwittingly invites inflated survey submissions. Further, I do not understand why the majority chooses a survey that was conducted more than four years ago. Noting that the trial in this case occurred in December 2004, it is not clear why the 2003 version of this survey is preferable to a later version.
Thus, while I have no qualms with trial courts using these types of surveys for broad guidance on this multifactor analysis, I would not elevate this survey as the lone representative of reliable reports that courts should use in beginning their reasonable fee analysis.
The majority also does not define the scope of its new rule. The majority has articulated a new rule for attorney-fee awards under MCR 2.403; yet that new test’s application to other attorney-fee contexts is left *555 for its readers to ponder. Indeed, the majority’s new test specifically incorporates the third factor under MRPC 1.5(a).[17] Does this now mean that the third factor of MRPC 1.5(a) is the starting point for all proceedings under that provision of our ethical code? Further, does this new rule apply to other fee-shifting provisions? For example, does the majority’s test apply to the fee-shifting provisions of the Uniform Condemnation Procedures Act, MCL 213.66, and the Michigan Civil Rights Act, MCL 37.2802, each of which involves reasonable attorney fees? And if today’s rule only applies to MCR 2.403, what is the basis for such a limited application of the new rule? I would not forge ahead in the name of consistency and ease of appellate review while concomitantly creating these uncertainties in the wake.
I also note that the majority mandates that the trial court decide whether it was reasonable for plaintiff to have two attorneys representing him at trial. I am aware of no authority that casts doubt upon the reasonableness of a party’s decision to retain the services of multiple attorneys at trial. In addition, if this multiple-attorney analysis is a new court-made factor in every reasonable-fee analysis, the majority should state as much. See note 5, supra. It should also note if this element, like all earlier elements, must also always be discussed by the trial court. See note 6, supra.
In the end, I can empathize with the majority in its desire to bring consistency to attorney-fee awards under MCR 2.403. But that desire is inconsistent with the rule’s inherently subjective analysis, and, with that in mind, the majority has gone to great lengths while *556 changing little.[18] The instant case is a perfect example of this. It is probable that when this case returns to the trial court, under the majority’s new test, that court will use the Snapshot, find an average rate for the locality, and then adjust that rate to comport with its original award. What is more, the trial court can support a reiteration of the fee award by simply restating its original rationale for its first award. Thus, I would not expend such effort and make these changes to our current method because they add little to the analysis while propagating the numerous questions I have noted. Instead, I would do as courts have been doing for the 25 years since Wood: simply evaluate the several factors that guide a court in assessing “a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation.” MCR 2.403(O)(6)(b).[19]
Simply put, this analysis cannot be molded into the mathematical precision that the majority seeks because, in the end, under either the Wood method or the *557 majority’s fine-tuned method, a trial court still exercises its discretion in assessing the reasonable value of the services that a particular advocate delivered in a particular trial. Not all attorneys are created equal, and the reasonable attorney-fee awarded under MCR 2.403(0) should recognize as much. Because the new method adopted by the majority does not reflect this as well as the Wood-factors method does, I respectfully dissent.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 The Wood test for a reasonable attorney fee includes the following factors:
*544 (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [Wood, supra at 588.]

 The trial court stated:
There’s no question Mr. Gittleman’s a recognized practitioner in the area of dental malpractice and has superlative standing in that area, has tried numerous cases. His skill, time and labor involved here was evidence [sic] from the professional way in which this case was tried. The amount in question, the results achieved... that was significant. The case was of difficulty because of the complexity of the issues involved.... There were significant expense [sic] incurred based on my review of the billings and taking all of those factors into account, I think that the 450 dollars rate is reasonable.

 The lead opinion states: “We emphasize that ‘the burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney’s own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.’ ” Ante at 531. The majority does not explain why a sworn affidavit by an officer of the court and member of the bar is not sufficient proof of the facts attested to within it, especially when those assertions are not countered by competing evidence.

 Indeed, the Snapshot expressly “concerns ... the ‘average’ attorney ... with respect to... hourly billing rates ....” See p 5 of the complete survey report, located at <http://www.michbar.org/ pmrc/articles/0000133.pdf> (accessed June 9, 2008).

 Under the lead opinion, it is unclear which “remaining factors” are usable in this adjustment calculation. Recall that under Wood, any of the enumerated factors were usable, as well as any other relevant factors. Wood, supra at 588. Also, MRPC 1.5(a), which the lead opinion expressly incorporates, enumerates several factors that are distinct from the Wood factors. Thus, it is unclear whether the “remaining factors” usable for this adjustment are those from Wood, MPRC 1.5(a), any other relevant factor, or all of the above. If the majority aims to malee appellate review of these questions more clear, this aspect of its new method is unsuccessful.

 It is illogical that a trial court would be required to articulate its analysis of the remaining factors that it found to be inapposite. I would not require the trial court to state that it found a particular factor inapplicable, when simply not discussing that factor would suffice to convey that point.

 The majority attempts to distinguish Randolph so that it may implement its new average-fee method (which is a modified version of the federal lodestar method that Randolph rejected) and claim that Randolph is not affected by today’s decision. While I agree that Randolph dealt with a different fee-shifting statute than the case-evaluation court rule at issue here, I note that the differences are irrelevant — at least with respect to the question of reasonableness.
Indeed, the statute in Randolph, MCL 213.66(3), mandates that the fee question hinge on the reasonableness of plaintiffs actual attorney *548 fees, whereas the case-evaluation court rule only allows a reasonable attorney fee for the services the aggrieved party was forced to procure as a result of the other party’s rejection of the case evaluation. In other words, this difference is only significant in the context that the fee analysis occurs: in MCL 213.66(3), the reasonableness of the fee actually charged is evaluated, and under the case-evaluation court rule, the reasonableness of the services necessitated is evaluated. However, that difference does not change the main issue, which is reasonableness. Indeed, the opinion per curiam in Randolph stated that “[ijnitially, the court must determine whether the ‘owner’s’ attorney fees are ‘reasonable.’ ” Randolph, supra at 765. Further, in this reasonableness analysis, the Randolph Court went on to include the factors in MRPC 1.5(a), id. at 766, which are the very factors that the majority now adds to the case-evaluation fee analysis. Accordingly, despite the majority’s attempt to say otherwise, the reasonableness analysis from Randolph is not so unlike that in today’s case. Additionally, Randolph expressly rejected any average-fee starting point. Thus, the majority cannot have it both ways. Either the reasonableness analysis under either fee-shifting provision includes an average-fee starting point and Randolph is partially overruled, or Randolph’s holding precludes the majority’s new fine-tuned average-fee starting point because it expressly rejected such a method.

 While it is true that MCR 2.403(O)(6)(b) relies on the reasonable hourly rate, it nowhere mandates, or even references, a starting point that hinges on the average hourly rate.

 The majority accepts as much in stating that the rule “only permits an award of a reasonable fee, i.e., a fee similar to that customarily charged in the locality for similar legal services, which, of course, may differ from the actual fee charged ....” Ante at 528 (citations omitted).

 The majority acknowledges these purposes of MCR 2.403(0). Ante at 527-528.

 It is true that in the “real world” one must assume that the value of the attorney’s trial advocacy is the same from one trial to the next because attorneys do not set their fees after trial by adjusting them for the results delivered. But MCR 2.403(0) is not constrained to the pretrial analysis like the average fee is; the rule depends on the reasonable fee for the services that were necessitated by a party’s rejection of a case-evaluation award.

 I am also not persuaded by the majority’s unsupported intimations that the Wood factors have been applied inconsistently and that they need a fine-tuned starting point. Nor do I accept the majority’s new requirement that trial courts discuss each and every factor in order to make appellate review possible. I note that the majority sees these very *551 problems as inconsequential in other contexts. For instance, in Kreiner v Fischer, 471 Mich 109, 133-134; 683 NW2d 611 (2004), the majority accepted a similarly subjective list of court-made, nonexclusive factors as giving acceptable guidance to a similar fact-intensive analysis. I dissented in Kreiner, but the majority in that case adopted a list of factors that, like the Wood factors, give no starting point, have led to seemingly disparate results, and have confounded appellate courts, as evidenced in this Court’s several peremptory reversals of the genuine attempts by the Court of Appeals to apply Kreiner’s amorphous factors. For the most recent examples of this reality, see Jones v Olson, 480 Mich 1169 (2008), and Minter v Grand Rapids, 480 Mich 1181 (2008). It is not clear why the Kreiner-factors method is not flawed for the same reasons that the Wood method is held to be today.

 Moreover, this testimonial requirement has no effect on this case because defendant expressly waived an evidentiary hearing on the fee issue when the trial court offered him one.

 While the majority allows for reference to empirical data found in surveys and other rehable reports, it only directly endorses one such report. It is unclear if there are other such acceptable reports, and what standard any other reports must meet to he admissible. Not knowing the answers to those questions, I limit my analysis to the single source that the majority endorses as acceptable.

 I also note that this 2003 survey puts the hourly rate for the 95th percentile in the highest paying locality in Michigan at $440.

 It is undisputed that the plaintiffs lead attorney is a specialist in the field of dental malpractice. He has extensive experience in this state and around the country in this field.

 The third factor of the reasonableness analysis of MRPC 1.5(a) evaluates “the fee customarily charged in the locality for similar legal services.”

 If the majority is earnest in its proclamation that it can implement its new version of the lodestar method without affecting Randolph, which expressly rejected such a method, it should pay heed to Randolph’s words regarding the consistency of attorney fee awards:
[Cjourts can and will reach different decisions concerning reimbursement of attorney fees. However, that is the nature of discretionary decisions. The key in each case is that the trial court provide a reasoned basis for its decision. [Randolph, supra at 767-768.]

 The majority misunderstands me when it claims that my protestations are based on the proposition that “a ‘reasonable fee’ for an exceptional lawyer cannot be determined by using the fee charged by the average attorney.” Ante at 535. This is not true. Again, my main contention is that the majority’s average-fee starting point gives inordinate weight to that factor, when the rule does not mandate such a starting point. I find that the Wood-factors method provides sufficient guidance. Stated as simply as possible, my position is this: Wood is good.